UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| AUSTIN CHRISTIAN GRIFFITH,<br><br>Plaintiff,<br><br>v.<br><br>FRANKLIN COUNTY, KENTUCKY, *et al.*,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) | Civil No. 3:16-cv-00077-GFVT-EBA<br><br>**OPINION**<br>**&**<br>**ORDER** |

*** *** *** ***

This is one of two recent cases involving pretrial detention at Franklin County Regional Jail.[1] Disturbingly, in this matter, Austin Christian Griffith, nearly died while in custody. The Defendants seek to resolve this case by way of summary judgment. [R. 68, 69, 71.] This requires the Court to consider for the first time the teachings of the Supreme Court in *Kingsley v. Hendrickson*, a Fourth Amendment case, in the context of the Eighth Amendment. 135 S.Ct. 2466 (2015). Ultimately, for the reasons set out below, the motions will be **GRANTED**.

**I**

Austin Griffith, an 18-year old man, involved himself in a botched robbery. [R. 101.] During that attempted robbery he was hit in the back with a baseball bat. *Id.* And so began his vomiting, which lasted from that point until he was life-flighted to UK Health. *Id.* But his troubles were not just physical, and he was arrested that same day. [R. 69-1 at 2.] Following his

---

[1] *Love v. Franklin County, Kentucky, et al.*, Civil Action No.: 3:18-cv-00023.

arrest Griffith was taken to booking. *Id.*

As is standard, a deputy jailer interviewed Griffith about his medical condition. *Id.* at 3. Griffith also admitted to having taken a Xanax and smoking marijuana a few times daily. *Id.* At this time, Griffith was made to understand that he could request a health care provider at any time while he was in jail. *Id.*

During this intake process, the deputy was given pause when Griffith cried while speaking to his mother. *Id.* at 4. Due to the serious charges, Griffith's emotional behavior, and young age, the deputy surmised that Griffith might be at risk for suicide. *Id.* So, she reached out to a clinician with the Mental Health Crisis Network. *Id.* The deputy described Griffith's emotional condition and shared her fear that Griffith had the potential to withdraw from alcohol or drugs. *Id.* In response, the clinician told her that Griffith posed a moderate suicide risk and he should be placed in general population with individualized observation for 48-hours. *Id.* As to the possibility of withdrawal, the deputy simply put a note to "refer to medical for obs." *Id.* Griffith was then placed in a "detox" cell on November 8th. *Id.* at 4. In this cell Griffith was checked every 20 minutes. *Id.* During that first night, the deputies logged Griffith vomiting seven times, a fact that Griffith attributed to nerves. *Id.*

Besides basic observation by jail deputies, all of Griffith's medical care was to be handled by SHP—a medical services contractor. *Id.* at 2. SHP employed licensed practical nurses Sabina Trivette and Heather Sherrow, registered nurse Brittany Mundine, advanced practice registered nurses Jane Bartram and Stacy Jensen, and facility physician Ronald Waldridge, MD to provide care. *Id.*

Nurse Sherrow was the first of SHP's employees to see Griffith. *Id.* at 5. She determined

based on the clinician's evaluation that Griffith was at moderate suicide risk—a classification to be reevaluated after 48 hours. *Id.* As a result, SHP staff observed Griffith twice daily. *Id*.

Later that same day Griffith put in a "sick call slip" because he had been vomiting for the previous two days. *Id.* Responding to Griffith's sick slip, Nurse Trevette took Griffith to the medical room for observation. *Id.* Once there, Griffith repeated his disclosure about drug use and complained about vomiting and diarrhea. *Id.* Despite Griffith's confession of drug use Nurse Trevette determined that Griffith did not appear to be withdrawing from drugs. *Id.* Instead, understanding that vomiting and diarrhea can cause dehydration, she checked his skin turgor. *Id.* Having determined that his turgor was good, she counseled Griffith on dehydration and prescribed him Imodium and Mylanta. *Id.*

Griffith's symptoms did not improve. The next day Griffith completed another sick call slip for stomach pain and puking. *Id.* During the nearly 24-hour period between sick calls he was observed vomiting six more times. *Id.* at 6. Responding again, Nurse Trevette checked Griffith's vital signs. *Id.* Despite vomiting on numerous occasions, he had not lost weight. *Id.* But in place of diarrhea, constipation had set in. *Id.* Given Griffith's symptoms, Nurse Trevette again reviewed hydration. *Id.* She told him to notify the staff if his conditions changed. *Id.* Separately, Nurse Trevette sought to place Griffith in a dry cell but was unable to do so since no rooms were available. *Id.* Griffith was returned to his detox cell. *Id.*

Over the next 24-hours Griffith was only observed vomiting two times. *Id.* Early in the morning on November 11, Griffith was re-evaluated by the Kentucky Jail Mental Health Crisis Network. *Id.* at 7. A clinician noted that he had not decompensated over the past 48-hours and had been observed for detox. *Id.* The clinician reclassified Griffith as a low suicide risk and he

was moved to general population. *Id.*

He was seen again by staff that day. *Id.* At that time, he was given a urinalysis. Nurse Trevette referred him to the APRN and recorded a physician's order for a seven-day regimen of Cipro. *Id.* Medical staff also gave him a Gatorade for dehydration. *Id.*

Over the next three days Griffith did not complete any sick call slips and had access to water which he drank when he was thirsty. *Id*. But Griffith says during this period he was not evaluated by medical staff despite continuing to vomit. [R. 101 at 12.]

Then, Griffith suffered his first seizure. [R. 69-1 at 7.] Nurse Mundine responded. *Id.* Griffith's cellmates informed Nurse Mundine that Griffith had been vomiting for several days—later confirmed by Griffith—and hit his head after the seizure caused him to fall off the bunk bed. *Id.* But Griffith showed no visible signs of a head injury and denied being in pain. *Id.* at 8. Before moving forward, Nurse Mundine discussed the incident with Nurse Sherrow over the telephone. Nurse Sherrow advised Nurse Mundine to treat Griffith's temperature, move him to the bottom bunk, monitor him, and complete a urine drug screen. *Id.* Once Griffith's gate steadied and his orientation returned, he was given Gatorade mix and taken back to his pod. *Id.*

Shortly thereafter, Griffith experienced a second seizure. *Id.* This time Nurse Mundine had Griffith transported to the local hospital. There he suffered a third seizure which caused him to be life flighted to UK Healthcare "with concern for severe lactic acidosis and acute renal failure." *Id.* at 9. Griffith was ultimately diagnosed with acute renal failure, seizure disorder, posterior reversible encephalopathy syndrome, hypomanesemia, and anion gap metabolic acidosis. *Id.* Griffith believes that all of this was avoidable if SHP had provided constitutionally adequate care.

Griffith is wrong. SHP and the jail's deputies were not recklessly indifferent to his medical need. Instead, Griffith's complaints sound more in state tort law. But this Court refuses to exercise pendant jurisdiction over those state law claims.

**II**

**A**

Summary judgment is appropriate where "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25 (1986). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.' " *Olinger v. Corporation of the President of the Church,* 521 F.Supp.2d 577, 582 (E.D.Ky.2007) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)). Stated otherwise, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.,* 285 F.3d 415, 424 (6th Cir.2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.,* 477 U.S. at 325. Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating the existence of a genuine issue for trial. Fed.R.Civ.P. 56; *Hall Holding,* 285 F.3d at 424 (citing *Celotex,* 477 U.S. at

324). Moreover, "the nonmoving party must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative evidence in support of its opposition to the motion for summary judgment." *Hall Holding*, 285 F.3d at 424 (internal citations omitted).

In applying the summary judgment standard, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259, F.3d 558, 566 (6th Cir.2001) (citing *Liberty Lobby*, 477 U.S. at 255). However, the Court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir.2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id*.

**B**

The primary claim brought by Griffith concerns an alleged violation of his constitutional rights. Such allegations are properly brought under 42 U.S.C. § 1983. Section 1983 does not create substantive rights but, rather, "provides a remedy for deprivations of rights secured by the Constitution and laws of the United States...." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982); *Mertik v. Blalock*, 983 F.2d 1353, 1359 (6th Cir.1993). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266,

271 (1994) (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989) (additional citations omitted)).

The Constitution guarantees "a right to adequate medical treatment" for both convicted prisoners and pretrial detainees. *Estelle v. Gamble*, 424 U.S. 97 (1976). Until this point, the extent of this right has been the same for pretrial detainees and convicted prisoners. To succeed on an action for deliberate indifference to medical needs, plaintiffs have been required to show: (i) an objectively substantial risk of serious harm, and (ii) that the jail or county officials were "subjectively aware of the risk." *Harbin v. City of Detroit*, 147 F. App'x 566, 570 (6th Cir.2005). The Supreme Court, however, signaled in *Kingsley* that this universal test for both pretrial detainees and convicted prisoners' claims was misguided. *Kingsley v. Hendrickson*, 135 S.Ct. 2466 (2015). The Court's holding suggested that pretrial detainees no longer need to prove that the defendant had actual knowledge to succeed on the second prong of the deliberate indifference test. Instead, a pretrial detainee only must show that the defendants "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Bruno v. City of Schenectady*, 727 Fed.Appx. 717, 720 (2018). That is, a pretrial detainee-plaintiff can succeed by pointing only to objective facts and without proving the defendant's mindset.

While *Kingsley* concerned only a pretrial detainee's Fourth Amendment excessive force claim, its holding has implications on all pretrial detainee's claims. In *Kingsley*, the Court only required the pretrial detainee to show that "the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 135 S.Ct. at 2473. To support a less stringent test, the Court cited: (i) precedent; (ii) workability; and (iii) the greater protections afforded by the

Fourteenth Amendment. *Id.* These rationales extend to pretrial detainee claims for deliberate indifference. The court explains each in turn.

First, precedent supports using an objective test for pretrial detainee's claim of deliberate indifference. *Kingsley* itself was not focused exclusively to excessive force precedent. *Id.* To the contrary, the Court looked at challenges by pretrial detainees generally—identifying a challenge to double-bunking. *Id.* Only one conclusion can be drawn from the wide-net cast by the Court: its reasoning was not meant to be constrained to excessive force claims. Indeed, a challenge to double-bunking provides a closer analogue to a deliberate indifference claim than it does to an excessive force claim. Unlike an excessive force claim—focused on the direct infliction of punishment—a conditions of confinement claim highlights the failure to provide a necessity. Likewise, deliberate indifference claims seek damages for a failure to provide something necessary—health care. Therefore, the Court's use of a pretrial double-bunking case supports an objective test for deliberate indifference to medical need claims.

Yet, this court is left with more than simply reading the tea leaves of precedent. The Court used broad language to convey its holding. Focusing on pretrial detainees generally, the Court reported that, to succeed, a pretrial detainee only needs to show that the government's actions were not "rationally related to a legitimate nonpunitive government purpose" or that the actions "appear excessive in relation to that purpose." Such language cannot be mistaken; *Kingsley* is meant to apply to all pretrial detainees. *Miranda v. County of Lake*, 900 F.3d 335, 351 (7th Cir. 2018); *Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016).

Second, applying an objective standard to claims of deliberate indifference is workable. Experience belies any concerns that an objective standard will permit illegitimate claims to

succeed. *Darnell v. Pineiro*, 849 F.3d 17, 36 (2nd Cir. 2017). Prior to *Farmer*, some courts in the Second Circuit used an objective test. *Id.* During this time the number of claims a court saw was not dependent on the test used. *Id.* And, in any event, the Prison Litigation Reform Act stands as a backstop against vexatious or illegitimate claims made by prisoner litigants. *Kingsley*, 135 S.Ct. at 2466.

Furthermore, concerns that prison officials will lose their ability to maintain order and institutional security are simply unfounded. The objective standard still requires recklessness, not simple negligence. As a result, officer's will not be handicapped in their ability to make quick judgments under unfavorable conditions. And, to the extent that illegitimate claims survive, *Kingsley* recognized that this factor is not enough to apply a subjective test. *Darnell*, 849 F.3d at 36. Constitutional rights do not cede to such rare occurrences or practical considerations.

Third, the Fourteenth Amendment affords pretrial detainees greater protections than those afforded to convicted prisoners by the Eighth Amendment. *Miranda*, 900 F.3d at 352. Unlike convicted prisoners, a pretrial detainee cannot be punished at all. *Id.* The Eighth Amendment, with its focus on impermissible punishment, merely sets the baseline of treatment. *Id.* A pretrial detainee is guaranteed more. *Id.* Because they are held prior to a determination of guilt, they are presumed innocent. Punishment is not appropriate. *Id.* at 350. Since punishment is not the focus for evaluating liability, the testing of a claim must focus on objective conditions—not the mindset of the defendant. *Id.* at 353.

Despite clear guidance by the Supreme Court, the Defendants assert that Sixth Circuit precedent requires applying the subjective test to claims of deliberate indifference. The case

cited by the Defendants, however, uses the traditional test without consideration of *Kingsley* or its effect on the deliberate indifference standard. *Winkler v. Madison Cnty*., 893 F.3d 877, 890 (6th Cir. 2018); *Hopper v. Phil Plummer*, 887 F.3d 744, 756 (6th Cir. 2018) (same) (forfeited objective test at magistrate stage); *Bays v. Montmorency Cnty*., 874 F.3d 264, 268 (6th Cir. 2017) (same); *Brown v. Chapman*, 814 F.3d 436, 444 (6th Cir. 2016) (same); *Baynes v. Cleland*, 799 F.3d 600, 618 (6th Cir. 2015) (same). In none of these cases was *Kingsley* directly addressed by the litigants. Nor was the same directly considered by the court itself. The only Sixth Circuit case to contemplate *Kingsley*'s foundational shift for pretrial detainees recognized that there is now "serious doubt whether" a plaintiff needs to "show that the individual defendant-officials were subjectively aware of [his] serious medical conditions and nonetheless wantonly disregarded them." *Richmond v. Huq*, 885 F.3d 929, n. 3 (6th Cir. 2018).

Continued use of the subjective test in other circuits is similarly unpersuasive. Each of these cases contains a dearth of reasoning, whether it is the Eighth Circuit in assertion without reason that *Kingsley* is limited to excessive force claims, or the Fifth and Eleventh Circuits rote application of a circuit rule. *See Whitney v. City of St. Louis, Missouri*, 887 F.3d 857 (8th Cir. 2018); *see also Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla*., 871 F.3d 1272 (11th Cir. 2017); *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415 (5th Cir. 2017). None avails this Court. We must faithfully apply the Supreme Court's precedent regardless of rules peculiar to other circuits. To do that, this Court must apply the objective test to claims of deliberate indifference.

**C**

Federal qualified immunity "protects government officials from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation and internal quotation marks omitted). When evaluating such claims, courts generally apply a two-step analysis. First, the court must consider whether "[t]aken in a light most favorable to the party asserting the injury, [ ] the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Second, the court asks whether the right at issue was "clearly established." *Id.* "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau v. Haugen,* 543 U.S. 194, 199 (2004). "The burden of convincing a court that the law was clearly established rests squarely with the plaintiff." *Key v. Grayson,* 179 F.3d 996, 1000 (6th Cir.1999) (citation and internal quotation marks omitted). Although at one time courts were required to follow these steps sequentially, the Supreme Court has abandoned that position and now permits courts to "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson,* 555 U.S. at 236. Here, Griffith's right to medical treatment for a serious medical need has been established since at least 1987. *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 545 (6th Cir. 2008).

To succeed on a claim of deliberate indifference to medical needs, Griffith must show that the defendants "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Bruno v. City of*

*Schenectady*, 727 Fed.Appx. 717, 720 (2nd Cir. 2018); *see also Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016); *Miranda v. County of Lake*, 900 F.3d 335, 351 (7th Cir. 2018).

**1**

Griffith must begin by showing that he had a "serious medical condition." A serious medical condition is apparent when the symptoms evidence the need for medical attention that is "so obvious that even a layperson would recognize" the need for help. *Blackmore v. Kalamazoo Cty.*, 390 F.3d at 899–900 (6th Cir. 2004) (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir.1990)). Prison and health official knew Griffith was vomiting, and vomiting often, shortly after he arrived at the prison. And by the end of his detention he was besieged by two seizures. Taking evidence in a light most favorable to Griffith this is a serious medical condition.

**2**

At the next step, Griffith must prove more than simple medical malpractice—he must show a reckless disregard of his "serious medical condition" by the Defendants. Griffith points to numerous incidents he believes evidences a reckless disregard by SHP's staff before and after his seizure. Each complaint shares a common thread—Griffith believes his care was inadequate, not absent. The Court begins by walking through these incidents. The Court finds that, even taking the evidence in a light most favorable to Griffith, his care was not constitutionally deficient.

**a**

Nurse Sherrow saw Griffith first. He complained to her that he was feeling nauseous and

vomiting. In Griffith's estimation, these symptoms should have caused Nurse Sherrow to refer him immediately for medical observation or place him on detox monitoring. [R. 101-26 at 5.] But, Griffith was monitored. [R. 69-1 at 3.]

When Nurse Trevette saw Griffith that same morning, Griffith again complained of nausea, vomiting, and diarrhea. So, she performed an independent nursing assessment, which confirmed that his skin turgor was good. Positive results on that test meant Griffith likely was not dehydrated. Nonetheless, Griffith says Nurse Trevette failed him in three ways: by neglecting to perform an abdominal assessment; not contacting Doctor Waldridge since vomiting can be a sign of benzodiazepines withdrawals; and not reassessing Griffith before leaving or telling the officers who to contact in case his symptoms worsened. [R.101-26 at 5.]

Nurse Sherrow returned that next morning but did not reassess his condition. Instead, she simply recorded that his morning medication had been taken. Griffith alleges Nurse Sherrow should have reviewed the deputies' logs. *Id.* at 6. If she had, then she would have been aware of the life-threatening condition his frequent vomiting had put him in. Or so Griffith claims.

Later that same day, Nurse Trevette responded to Griffith's sick slip for "stomach puking." She checked his signs and found that they were good. Griffith was cooperative, alert, oriented, had a steady gait, good skin turgor, his respiration was even, his abdomen was good, and he had not suffered weight loss. She also noted that his ingestion of Imodium reflected well on his condition. Griffith did, however, mention that he was constipated. With these symptoms in mind Nurse Trevette educated him on hydration and told him to notify anyone if his status changed. Griffith says Nurse Trevette should have inquired into the frequency of his vomiting or reviewed the logs. *Id.* at 7. Again, he says Waldridge should have been contacted and a plan

developed for monitoring his condition. *Id.* A mistake he says was repeated that same day when she noted that Griffith had taken his medications but did not ask about his condition.

The next day, after Griffith was moved to general population, he was seen again by Nurse Trevette. Because he was still vomiting, she ordered a urine test, which showed Griffith had a large amount of protein, moderate blood, small ketones, and bilirubin. Griffith contends that days of vomiting and abnormal urine results should have caused Nurse Trevette or Nurse Sherrow to contact Doctor Waldridge. *Id.* at 7-8. Instead, he says Nurse Trevette exceeded her scope and wrote a script for an antibiotic. *Id.*

* * *

Then, after three days of no recorded health issues Griffith suffered a seizure. He claims Nurse Mundine should have investigated why he did not come down for the medical pass on November 14 for his antibiotic treatment. *Id.* at 9. But Griffith has offered no evidence, expert or otherwise that the failure to investigate violates the standard of care. Nor does he prove it a violation of SHP Protocol. Griffith's failure to appear was documented in the Medical Administrative Record but not as refusal because it was not affirmatively made.

Griffith also thinks that Nurse Mundine's response to his seizure was inadequate. *Id.* But Nurse Mundine took swift action to help Griffith. She first took him to the medical unit. Once there, she checked him for a head injury, conducted an interview, provided him medication required by standing orders for fever and vomiting, performed a urinalysis to rule out a UTI, provided him with Gatorade and contacted another RN.

Afterwards, Nurse Mundine developed a plan of care including further observation. Partly at Griffith's behest she determined he was stable enough to return to his bunk. This was

another example of Griffith dictating his care. Once there, she instructed the guards to move him to a lower bunk as a precaution in case of another seizure. At this time, Griffith believes Doctor Waldridge should have been contacted or he should have been sent to the hospital. *Id.*

**b**

At bottom, Griffith is claiming that SHP and its employees provided inadequate care. But where some care has been provided the court rarely second guesses the adequacy of that care. *Asplaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011). The exception to this rule is when care remains the same, but the plaintiff's condition rapidly declines. In *Rice*, for example, the decedent began suffering from severe withdrawals—e.g., shaking hands, defecating on himself, unsteady gait. *Rice v. Montgomery Cty., Kentucky*, 2016 WL 2596035, at *2 (E.D. Ky. May 5, 2016). As the time of his detention lengthened, his condition worsened. But SHP ignored these obvious warning signs and did nothing to effectively escalate their care. *Id.*; *see also Miranda*, 900 F.3d at 335 (failure to respond to a plaintiff whose failure to eat resulted in a swiftly declining condition could constitute reckless disregard of a serious medical condition). Griffith's case is not analogous; unlike the decedent, his condition remained relatively stable. Instead, SHP's staff responded to Griffith's complaints by ensuring that his vitals were within normal range—each time finding they were. Griffith can argue that SHP's response to his condition was not perfectly proportional; that they should have done more. But that is not the constitution's test. No one ignored or recklessly endangered Griffith.

Moreover, Griffith's own conduct undermines his claims. A detainee, just as any normal patient, must be his own best advocate. *See Napier v. Madison Cty., Ky.*, 238 F.3d 739 (6th Cir. 2001) (finding that a dialysis patients insistences that his dialysis treatment was unimportant

undermined his claim for deliberate indifference).  Griffith undercut the likelihood that his health care providers would escalate their care when he insisted he was fine, blamed his condition on nerves, and asked to return to his pod.  A patient's own behavior that reduces the effectiveness of treatment cannot then be used as a sword to establish liability.  For similar reasons, Griffith's complaints about not being seen for three days are unavailing.  Every time Griffith completed a sick slip he was promptly seen.  His decision not to complete a sick slip during that time cannot then be used to help establish a claim.  During that time period, at best his cellmates expressed concern to the guards—that is insufficient notice under the circumstances.

Regardless of the care given, Griffith protests that protocol was not followed.  However, a failure to follow SHP's policies by itself is not enough to trigger a violation.  *Rice*, 2016 WL 2596035, at *10.  Yes, in an ideal world Nurse Trevette and Nurse Sherrow would have contacted Doctor Waldridge as protocol guides them to do, but that mistake does not make them recklessly indifferent to Griffith's medical condition.

Finally, Griffith has failed to show a causal link necessary for his claim to succeed. *See* Garretson *v. City of Madison Heights*, 407 F.3d 789 (6th Cir. 2005).  Griffith points to no test which if performed would have prevented the harm.  Indeed, Griffith often complains of a testing not done, which was just delayed.  In each of those instances, the test revealed nothing that would have changed Griffith's care.  Even with his seizure, Griffith does not put forward medically verifying evidence that the delay induced any harm.

**d**

Unlike the previous defendants, neither Doctor Waldridge[2] nor Jailer Rodgers was involved in the care of Griffith at all. [R. 69-1 at 12.] Indeed, both men had no knowledge that Griffith was even in the jail. This is fatal to Griffith's claim. A government official cannot be held personally liable unless they personally "caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Griffith's alternative argument that Doctor Waldridge had a duty to him sounds in state tort law and is best left to state court to determine it.

But Griffith alleges that Doctor Waldridge and Rodgers's absence was part of the problem. He contends that they failed to supervise their subordinates. Since liability cannot be based on a theory of respondeat superior, Griffith must "[a]t a minimum ... show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Hicks v. Frey,* 992 F.2d 1450, 1455 (6th Cir.1993). As explained

---

[2] Doctor Waldridge, first, disputes that he is a state actors subject to § 1983 liability. *Jones v. Duncan*, 840 F.2d 359, 261-62 (6th Cir. 1988). However, a private individual is a state actor if he performs a public function. *Carl v. Muskegon Cty.*, 763 F.3d 592, 595 (6th Cir. 2014). Such public function must be one that is "traditionally exclusively reserved to the state." *Id.* And, providing medical care to detainees is exactly such a function. *Id.* Yet, Doctor Waldridge argues his extra step of removal—the contractor of a contractor—shields him from liability. This is incorrect. *Id.* ("[w]hether [a doctor] was employed directly by the state does not control whether she was a state actor"). Instead a physician's duties determine whether his actions "can be fairly attributed to the state." *Rice*, 2016 WL 2596035, at *10. Here, Doctor Waldridge was tasked with the traditional state function of providing medical care to pretrial detainees. For liability purposes then Doctor Waldridge is a state actor.

Doctor Waldridge has made this argument unsuccessfully on numerous occasions—it is becoming a waste of judicial resources. Such an argument is also an odd litigation strategy. If he was to prevail it would likely be a pyrrhic victory given the state law claims lurking in the background, especially given the power shield qualified immunity provides against liability.

above, there is no evidence that Griffith's rights were violated by SHP's nurses. And, the deputy jailers and Jailer Rodgers are permitted to rely on the assessment of medical professionals. *Graham ex rel. Estate of Graham v. Cty of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004). Therefore, no liability can attach to either Doctor Waldridge or Jailer Rodgers.

**D**

SHP, Franklin County and Fiscal Court Members cannot be held liable for a failure to train when there is no underlying violation. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001). Because SHP provided constitutionally adequate medical care and the County reasonably relied on that care, Griffith's remaining claims against those Defendants must be dismissed.

**3**

The Court declines to exercise pendent jurisdiction over the remaining state law claims over which there is no other basis for federal jurisdiction. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130 (1966); *Weeks v. Portage County Executive Offices*, 235 F.3d 275, 279–80 (6th Cir.2000).

**III**

Once the party moving for summary judgment has satisfied its burden of showing "an absence of evidence to support the non-moving party's case," *Celotex*, 477 U.S. at 325, the burden shifts to the non-moving party to come forward with specific facts demonstrating the existence of a genuine dispute. *Hall Holding*, 285 F.3d at 424 (citing *Celotex*, 477 U.S. at 324). Here, the Plaintiff has not shown that a genuine issue of material fact exists concerning the required elements of any of their claims. Accordingly, and the Court being otherwise sufficiently

advised, it is hereby **ORDERED** as follows:

1. Defendants' Motions for Summary Judgment [**R. 68; R. 69; R. 71**] are **GRANTED** for all federal claims brought against all Defendants;

2. The remaining state law claims are dismissed **WITHOUT PREJUDICE**;

3. All remaining motions are **MOOT**;

4. The Final Pretrial Conference scheduled for September 18, 2019, and the Jury Trial scheduled for October 15, 2019, are **CANCELLED**;

5. This is a FINAL and APPEALABLE ORDER and there is no just cause for delay; and

6. The Court will enter an appropriate judgment contemporaneously herewith.

This the 27th day of March, 2019.

Gregory F. Van Tatenhove
United States District Judge